Thank you, Your Honor. Peter Simmons again for Capitol Records, the EMI plaintiffs. We're turning now to the district court's second order of April 21st. And that order had distinct findings concerning, on the one hand, MusicNet and my client, EMI, and on the other hand, PressPlay and UMG Universal. MusicNet and PressPlay were distinct entities with different shareholders and different approaches to the market, and they made different submissions to the government. So I'm going to talk about the issues concerning MusicNet and EMI, and then in the next appeal, Mr. Dellinger will deal with the second half of this order, namely those issues affecting UMG and PressPlay. Okay. Now, insofar as EMI is concerned, the facts are very straightforward. Can we deal first with the appealability? This case comes up in a slightly different posture, and we attempted to at least alert you to one difference that we saw in our order. Does it make any difference to the appealability under the collateral order doctrine that you filed a motion for reconsideration that was, in fact, still pending in the district court at the time you had an appeal pending here, and that you sought to introduce a lot of documents in this court that you had also sought to introduce before the district court? I mean, that begins to sound less and less final to me. When you're trying to get a reconsideration, when you've got all kinds of documents, you're saying to the district court, you know what, these are really relevant to your decision. Could you address that, please? Sure. Under Rule 4A of the Rules of Appellate Procedure, our notice of appeal that was filed while the motion for reconsideration was still pending, it functionally gets held in abeyance until that motion is decided, which it was on May 17th. Well, it was decided in an odd way. She says she doesn't have jurisdiction because the appeal was pending. And then she says, and if I were to decide it, you'd lose. But she says, I don't have jurisdiction. Right. But the important thing for this purpose is she has then gone on and given you exactly what her views are. Namely, and what she says, even if the Court retained jurisdiction or in the event of a remand, the Court would not be inclined to reconsider and then give three-and-a-half pages of analysis so that you have the benefit of her entire analysis on all the record, including the documents submitted on the motion for reconsideration. It is as final as it's going to get in front of the district court. She's considered everything. She's given us her views on everything. There is nothing further before her. And there's nothing that on a remand she would do differently because she's already said, if you remand, here's what I'm going to do and why. So for purposes of the collateral order analysis, it is final. We have her ---- You think Judge Patel might change her mind? We had hoped she would change her mind. That's why we filed the motion that we did. And she looked at it and said ---- Me now. All I can tell you, Your Honor, is that we put before her the same evidence and made the same kinds of arguments that we're making before this Court. And she said, you have my views. I'm not changing my mind. So I think, you know, for purposes of the finality analysis under Cohen, that decision is final, and it's not as if the motion for reconsideration would change her views because she has done that analysis and given you three-and-a-half pages of reasoning as to why she doesn't think that changes anything. Now, because the other side didn't raise this question, and because I guess the Supreme Court has now told us that these rules aren't jurisdictional in the first place, have they forfeited any objection that we should just shrug our shoulders and go on anyway? Do you understand that question? I'm not sure. The Supreme Court has said that the rules, the Federal rules that establish time limits and such aren't really jurisdictional. They're not truly jurisdictional. They're just really rigid if somebody says something. And nobody said anything here. Does that make a difference? I don't know that it makes a difference under this Court's holdings. I would love to say that it isn't, that, you know, to the extent that Mr. Kecker had an objection, it's been waived. But I'm not sure you can read this Court's decisions that way. I'd love to. Okay. But I think the fact of the matter is, in looking at the Cohen analysis, which is, has the issue now been conclusively resolved? Is there anything else that could be learned from the district court that would suggest that the appellate court ought to stay its hand and wait until the record's more fully developed? The answer in this case is, as the record's more fully developed, the arguments were fully presented. The Court has presented its full analysis. And that's frankly what distinguishes this case from the Miller v. Marriott case, where the district court did not give its analysis on the motion for reconsideration or where it was remanded for that to be finally addressed. Okay. On the assumption that we have appellate jurisdiction under the collateral order doctrine, let's go. I gave you a detour. That's okay. The district court's order here, finding criminally false statements in the Music Net white paper given to the Justice Department, rests on two erroneous premises, one concerning the licensing of musical content into Music Net from the record labels, and the other concerning the distribution of the aggregated content out of Music Net. Did the district judge apply the right standard in determining whether or not the crime under 1001? Well, I believe the Court erred in not even looking at the Sienta requirement. There's no analysis, in her opinion, of intent to make a false statement. Basically, she says, I look at the statements, I find they're false, and I think she's wrong. No, she didn't quite say that. She said misleading, if not false. And, you know the --- Is that the right standard? Well, no. Under 1001, it has to be false or fraudulent. And the word misleading is not there. Maybe she meant misleading to mean fraudulent, but she doesn't say that. So there is some ambiguity even in her finding of falsehood as to whether she would meet whether what she did was properly apply 1001. And certainly there was no finding on intent. But even her analysis of falsehood rests on numerous errors. With respect to the Most Favored Nations Clause, her analysis of the EMI content license to MusicNet, what she did was jump to the assumption that a Most Favored Nations Clause in EMI's content license is tantamount to price fixing. She said MFN clauses result in uniform pricing regardless of the written terms of the content licenses. There was no evidence to support that conclusion. There was no doubt. You had an opportunity before the motion to reconsider to present evidence that, if I believe your evidence, put the lie to it. Why did you keep your mouth shut? Well, no, Your Honor, we absolutely attacked that and said it's a totally unfounded speculative assumption. It's contrary to law. But why didn't you include the documents that were later included in the motion for reconsideration? Our position was that Hummer-Wendland had not met its burden of proof, either on the facts or on the law. And we outlined for the judge that the issues they were raising, such as, gee, there was this MFN provision suggested in an e-mail, and the e-mail was secret. And we said, no, it wasn't. We laid this all out for the Justice Department in EMI's separate white paper. We walked the judge through where we disclosed to justice in the EMI's separate submission, the Most Favored Nations Clause, the e-mail suggestion that there be a Most Favored Nations Clause. We cited the document by Bates number. We attached it as an appendix to our white paper. We laid this all out for the judge, even showing that the exhibit that Mr. Kekker's firm submitted was identical to what we gave to the Justice Department, albeit under a different production number. Well, assuming for the moment that Most Favored Nations Clauses have a tendency to drive all the terms eventually to being essentially the same, and the whole industry uses Most Favored Nations Clauses, is that relevant to our decision here? I mean, if everybody uses them and, therefore, it's all driven to that, what's the joint venture got to do with the problem? The problem is the Most Favored Nations Clause, and that's not the case we're talking about. No. Well, there are several problems there. Number one, even the fact that multiple parties have MFN clauses does not show price fixing. That was the Second Circuit's decision in the DuPont case where they rejected the FTC's argument on that very issue. Secondly, the facts here don't support it. EMI was the only one of the three record companies in MusicNet with an MFN clause. The speculation that the whole industry uses them is unsupported by the evidence. There's nothing in there. And when you look at the actual licenses that the three record labels in MusicNet gave, EMI, Warner, and Bertelsmann, only EMI has an MFN clause. The others don't. So this idea that, well, everyone has them, and, therefore, you know, it's a code indirect way of saying we're all going to agree to the same terms is just not right. And when you look at the actual license terms, they are different. The Justice Department did look at the actual license terms. And that's in the record. It made a factual determination, closing its investigation, having looked at the licenses and the activities of the companies in the marketplace, we find there's disparate behavior. In effect, Hummer-Winblad is arguing, well, that's not true, but what do they have to support it? Nothing. The district court implicitly said DOJ must not know what it's talking about, because she says, gee, there's an MFN clause, and, therefore, automatically prices are equal. Not only is that unsupported by any evidence they offered, it's inconsistent with the contracts. It's inconsistent with the absence of MFNs in the other record labels contracts. And she is functionally saying the Justice Department didn't know what it was doing when it conducted its 18-month investigation. On what basis she found that, I don't know. There was no evidence in the record for it. So her analysis on the MFN clause is wrong on the facts and is wrong on the law. Now, turning to the second thing that she said was false in the MusicNet white paper, she said the MusicNet stockholding – she said the MusicNet white paper says that EMI is not entitled to see MusicNet's distribution agreement with Napster. Not true. What she did was she looked at one or two lines of the MusicNet white paper completely out of context. The preceding page to what she focused on, page 21, specifically says that Real Networks and Warner, two of the four shareholders in MusicNet, are not allowed to see distribution agreements because they have affiliates that have distribution agreements of their own. Footnote 35 on the page she looked at specifically cites Section 5.4c of the stockholders agreement and quotes it. And she didn't focus on that language. And if you parse the language of the contract quoted in the footnote, it draws the distinction between what are called distribution stockholders, capital D, capital S, which are Real and Warner, the companies with distribution agreements of their own, as opposed to other stockholders, capital S, no adjective. And what it says is all stockholders, which includes EMI, shall make sure that their designated directors don't disclose to distribution stockholders, those with their own distribution agreements, the terms of any distribution agreement. That makes sense because the whole structure within MusicNet was to make sure that competitively sensitive information was not shared. Not that no information is shared, but that competitively sensitive information doesn't get shared. Because EMI was not a competitively sensitive document. The distribution terms that Napster got from MusicNet were not competitively sensitive. And under the terms of the document specifically quoted and cited to in the MusicNet white paper, EMI was absolutely entitled to see that document. The district judge made no analysis of the terms of the stockholders agreement. She took the one sentence in the white paper and removed it from its context of the underlying document. I mean, the whole purpose of the DOJ investigation was to understand how these entities, MusicNet and Pressplay, worked. Kennedy. It's a little unfair to do this, maybe. But in the last argument, we heard not from you but from your co-counsel that one of the reasons we shouldn't be hearing this on appeal under the collateral order doctrine is that we'd be getting into the merits. You're pretty deep into the merits. No. This is entirely collateral to the underlying issue of copyright infringement or antitrust violation in the underlying case. It sounds to me as though it's pretty closely tied. I mean, what you're talking about is are they looking at things that give them the sort of what otherwise should be confidential information? Well, all of a sudden, you're, that's where we are. This sounds like we're halfway or maybe three-quarters of the way into the lawsuit. We're not nearly halfway or three-quarters of the way into the lawsuit, as the 120-odd depositions we've taken in the lawsuit demonstrate. But, no, I mean, the threshold question here is have they demonstrated that MusicNet committed a fraud on the Justice Department? You can't find a direct interpretation of the MFN, and you can't find a fraud saying that we hid something regarding or made a misstatement regarding EMI's right under the document, under the shareholders' agreement, to see the NAPSA distribution agreement when we laid that all out for Justice. We gave them the stockholders' agreement. We quoted it. We cited it. We cited the section by number. That's the question here. It's not was it good, was it bad, was MusicNet a good venture or a bad venture. Do you have a sort of parade of horribles policy argument for us as to say if the attorney-client privilege is vitiated here, what happens to the – I mean, this is only one example. It's only one department of the government. I mean, we've got enforcement proceedings at the SEC. I mean, you know, so what happens? Let's hear it. Well, obviously, Judge, that is a very real concern, particularly given the overbreadth of the Court's order here where the Court said that the privilege should be vitiated as to the entire DOJ investigation and any analysis that we made of the issues at stake in the DOJ investigation, and particularly where the predicate for that is, you know, you gave the Justice the evidence, you laid it all out, nothing was concealed, but you didn't interpret the evidence quite the same way that I do now, and therefore, I find your attorney-client privilege to be vitiated. That doesn't even come close to meeting the standards under 1001. And if that were the test, then, yes, every time somebody proffers evidence to the SEC, to the Justice Department, to a regulator, and says, here are all the documents, here's the evidence now, here's why we think that evidence shows we didn't do anything wrong, a court looking at that, second-guessing that, as some sought to have the Court do here, says, well, I look at it differently, therefore, I find you allying to the regulator. And what happens if instead of saying, here's all the evidence, they say, well, here's some of the evidence, and we don't think we did anything wrong? What happens if they say, here's all the evidence we think is relevant, and we didn't do anything wrong? It turns out there's some other evidence that other people might have thought relevant. I mean, where is this going? Well, and that, of course, is one of our concerns here, is that Judge Patel had only a tiny fraction of the evidence that the Justice Department had before it. And she made the findings of falsity based on this fragmentary record. I mean, there were literally millions of pages produced by dozens and dozens of individuals and companies in the course of the decade. The contracts produced to the Department of Justice? Absolutely. Every single one of them was attached? The yes. The Music Net stockholders' agreement was attached as an appendix to our white paper. The content license was attached as an appendix to our white paper. The e-mails that they debate were attached as an appendix to our white paper. So it wasn't even an issue of, gee, go find these in the mound of evidence that we gave you, the millions of pages. We said, here are the absolutely critical documents you're going to want to read. Here are the controlling documents. It's absolutely critical. I ask you, were all the documents provided? Yes. Nor does Hummer Wynblad contend otherwise. I'm sorry? I said, nor do they contend otherwise. They never contested. And you won't find anywhere in their brief any suggestion or any evidence that anything was withheld by EMI or Music Net. And I'd like to save the remaining couple of minutes, if I may, for rebuttal after Mr. Kakar is done. Good morning, Your Honors. I'm John Kakar for the Hummer Wynblad Entities and Defendants. I thought the best use of my time, since it appears that you have fairly firm views on both the standard to be applied and the collateral order doctrine, although I'm happy to talk about either of those, would be to jump into the densest part of this appeal, which is the applicability of the facts to the record, because I think that they have been very unfairly treated. Before you get there, could you address the collateral order doctrine as applied to this case? That is to say, this case is a little different from the one we heard earlier, given the motion to reconsider and the documents that were sought to be put before the district court on the motion to consider, which appear to be the same documents that we have that they're trying to present to us. Well, we can't make a difference to the collateral order doctrine. It's not particularly useful to our position, but we don't think that it does under these circumstances. We think that our position has been that the collateral order doctrine does not apply to this case, because this kind of discovery dispute, I understand that there's precedent, you've written a lot of it, but this kind of discovery dispute is always going to be relitigated in the district court. There's going to be motions to reconsider. There's going to be motions to renew based, or renew the motion based on new facts. There's going to be litigation about the scope of what this order means, whether it covers those documents or those documents. And for those reasons, we took the position initially that Cohen didn't apply, shouldn't apply to this case, and that it shouldn't be reviewed. We don't think that that position is added to by the fact that they filed a motion for leave to file a motion to reconsider. I do want to emphasize for the Court, though, that this notion that everything was before the district court is completely wrong. They filed a motion for leave to file a motion for reconsideration. They dumped a huge amount of material into the record that was not before the judge before, including a number of these agreements, which they're now mentioning in response to Judge Rawlings' question. I may be wrong, but I think what he was saying was everything was in front of the Justice Department. That's what he said. And I'm saying that a lot of what they then decided was relevant that was before the Justice Department they tried to put into the district court record. We filed a motion to strike. A panel of this Court denied the motion to strike. And I don't know whether it's still pending before you or not, but here we are. And our position still is that this Court ought to decide this case on the record that was before Judge Battelle, which does not include this material that was put into the record afterwards, and which is quite extensive. And I guess the important point that I want to make is if we'd had a chance to respond to that material, we would have had a lot to say. For example, this notion that they argue that if you look at all three MusicNet licenses, they are different. They actually have an appendix in their brief. What they don't put is that the most important, really the only important term in that license for purposes of this appeal is what they're going to make. And all three of them agreed to make the same thing. They're going to take 50 percent of net revenues and they're going to carve it up according to their proportion of usage. They talk about differences. If we'd had a chance to point out similarities, we would have been able to do that. So the record is not complete in the district court. But having said that the district court considered those documents when deciding that if she were to reconsider, she would not be inclined to change her opinion, didn't she consider those supplemental documents in that context? Yes, Your Honor. She said, I don't have jurisdiction, and then she went on without any briefing from us to deal with those documents to say why it wouldn't have made any difference in her opinion. But what my point is, she didn't have a full record in the sense of us having a chance to respond to this new material. Well, that decision was not separately appealed anyway, was it? It was not. And we believe it's irrelevant that all those documents and that decision is irrelevant to what is before you today. But I want to talk about here. We heard a lot about most favored nations clauses. It's my understanding that you were looking at the record, the record before the district court, and seeing if her decision is supported. Can we ask first as to the standard that she's using to judge whether or not the crime fraud exception is properly invoked? Yes, Your Honor. And on this one, this is not as we believe, not as complicated as the Bertelsmann EMI dispute about the standard. Here, Judge Patel said something that sounded very, very close to what Judge Fernandez said. She said there's two paths to follow. She said this at page 5 in her opinion. Path number one is to show that the Chin standard, she cited in Ray Grandjury's case, but it's the Chin standard of reasonable cause to believe that the attorney's services were utilized in furtherance of the unlawful scheme. And if the party persuades the judge of that, then the documents get produced. A second basis is the Zolan standard, which she saw as a different set of legal requirements and facts. And there the issue is a factual basis adequate to support a good-faith belief by a reasonable person that in-camera review of the materials may reveal evidence to establish the claim that the crime fraud exception applies. And that is a very low standard, we think. Yeah. Okay. I'm after a, I won't say different, but a related question, which is to say the crime, if there was one, was violation of 1001. Correct. And what does she say is sufficient to violate 1001? She didn't talk about the elements, as I recall, but we know that the elements include false and fraudulent statements. Did she make a finding of a false or fraudulent statement? She used the words, as Judge Fletcher pointed out, misleading, if not false. But I believe, yes, I think a fair reading of her opinion is that she made a finding. But I guess a more important point that I want to make is that from this Court's point of view, we believe that you should follow the ten other circuits that apply abuse of discretion. And we believe the standard for this Court is to look at the entire record. How can we apply abuse of discretion on the question as to whether she applied the proper legal standard? I mean, the legal standard is what it is, and that's a question of law. That's correct. But the proper legal standard, the proper legal standard is abuse of discretion as applied to 1001, and 1001 says false and fraudulent statements are actionable, and she has pointed to what she thought were false statements. Well, but is. Deliberately misleading, if not completely false. That, I believe, says that's a false statement within the meaning you could prosecute a case, a 1001 case, that met that statement, United States v. Herod. Okay. So in your view, her paraphrase of the statute is applying the statute accurately? Yes, Your Honor. Okay. And when she says, as a result, the Court finds reasonable cause to believe that the statements related to safeguards in the white paper referring to EMI were deliberately misleading, we read that as acknowledging what she said earlier, that the standard is 1001 is what she's applying. She's not applying the wrong legal standard, we don't believe. Okay. And the record supports her for the following reasons. The white papers, even set aside MFNs for a second, these were the EMI white paper. It's not just the MusicNet white paper. It's the EMI white paper that the EMI lawyers wrote says, and I'm quoting, EMI has no knowledge of the specific terms of the other MusicNet agreements. It says it again, EMI is only aware of the terms of its own subscription service agreement with MusicNet. It says it again, EMI has no knowledge of the terms. We've cited these in our brief. The MusicNet brief, which was written by lawyers and reviewed by EMI lawyers, says, each party knows only the terms of its own agreement with MusicNet. Now, we know because both sides have quoted it, that there was an email on March 26, 2001, which says, from MusicNet boss to EMI chairman. In order to be responsive to your team's concerns that are specifically tied to a side letter between EMI and MusicNet that commits that EMI's core economic terms, price per song, advance, percent of revenue pool, will be no less favorable than BMG's and WMG's. And he goes on to say, we're not going to put that into an agreement because of antitrust concerns. Now, EMI did tell the Justice Department about that email. But I think it's important to actually read what they said about it. Said, they said Now, wait a minute. Let me make sure I get the premise. They provide the email. They provided the email. And then they characterized the email. And they characterized the email. In order, and they characterized it this way. In order to address EMI's concerns, Rob Glazer, who wrote the email, then chairman and acting CEO of MusicNet, mentioned in, to EMI in very general terms that the terms and conditions of EMI's agreement would be similar to Bertelsmann and Warner Music Group, although Mr. Glazer did not disclose any specific terms. That's how they characterized it. Counsel, how can that be misleading if the Department of Justice were provided with the actual email to make its own determination of whether or not the email was fairly characterized? I'm about to tell you, because four days later, in an email from the MusicNet general counsel to an attorney for EMI who was drafting the deal, this email was not provided by EMI to the Justice Department. The MusicNet general counsel said, we have simply been able to, the EMI general counsel was worried that they weren't going to get as good a deal as the others. So he's being reassured by the MusicNet general counsel, the man, they're drafting the documents. We've simply been able to use the work put into the previous agreements to come up with a deal that works and treats everyone the same. Believe me, neither of them has a leg up on EMI and these licenses. Rob Glazer, the CEO, has specifically ordered me to ensure equal treatment because of the personal assurances he's made to Eric. I've made a huge effort executing on that commitment. Now, once you know about that email, which EMI did not submit, and you go back and read the way they describe this very general terms and nothing specific, and you realize that the lawyers who were drafting it knew that they were getting equal terms, I think a reasonable person can conclude that we have got a substantial problem, a factual problem, not a problem of advocacy. And prosecutable as a crime? I think it could be prosecutable as a crime, of course. Somebody says, I mean, but somebody says, I didn't know about, we don't know the terms of anybody else's agreement with MusicNet. And then they say, and by the way, here's this kind of ugly email that says, but it's very general, it's not specific at all. And four days later, they're getting reassured by lawyers that the terms will be, quote, equal. We believe that that's a reasonable person. Put it that way. This is getting deeper into the evidence than I myself yet am comfortable with the evidence itself. I've just got to admit to you how far in or how far I am not in. But merely saying I get equal treatment with these others doesn't mean I know what treatment they're getting. I would respectfully disagree. I mean, if somebody says, you're going to get the same terms, they're going to be similar, and then somebody says they're going to be equal terms, equal is different from similar. Treatment is different than equal terms. Well, but my point is different yet. I'm being promised I'm going to get equal treatment or I'm being promised I'm going to get equal terms. Well, at that point, I know if the promise is kept, I'm going to get equal treatment and equal terms or equal terms. But I don't yet necessarily know what those terms are going to be because I don't yet necessarily know what they got. All I know is they're going to be equal. Well, and you're now, you're the attorney drafting. The agreements are signed about seven days later. And later on, when the Justice Department comes around and says, you know, we're concerned about dispersion and what you know and what the other people know and whether or not you know your competitors' information, and you say, don't worry about it, Mr. Justice Department, not as a matter of advocacy. Let me assure you factually, we don't know what their terms are. Under those circumstances, Your Honor, I think a reasonable person, which is I'm not a prosecutor, we're simply mere civil lawyers here. I think a reason — there is reasonable cause to believe that that is a false statement, that it is a deliberately false statement because the whole motivation here is clear and the repetition of it is clearly designed to persuade the Justice Department that there is a — that there is no exchange of this competitively sensitive information. Roberts. Now, does the — I'm sorry, go ahead. Now, does the Justice Department have not only this first e-mail that says we promise equal terms, but also have the contract that they later get? The Justice Department has the contracts, and they have the e-mail about equal terms from MusicNet Production, we know, but they don't have it from EMI, we know. EMI doesn't give them the e-mail. They might have given them the e-mail in redacted form, we suspect that, but the Justice Department did get the e-mail in this millions of pages from another vendor, namely MusicNet. When you say the e-mail, which e-mail are you now referring to? The e-mail I'm talking about is the one that EMI didn't give the Justice Department and didn't explain in the white paper, and that makes their statements in the white paper very problematic. But what's undisputed that the Justice Department has is they first have the e-mail that says we're getting equal treatment. No, no, no. We're getting similar — the first e-mail, which is at 286 in the excerpts of record, is a March 26th e-mail that says I'm willing to offer a side letter that commits to EMI's core terms, will be no less favorable. And that's the one that's described in the white paper as mentioning to EMI in, quote, very general terms that the terms and conditions would be, quote, similar, although Mr. Glazer did not say this. No, I understand all that. That's what the Justice Department had. And they have the contract ultimately signed. They have the contracts ultimately signed, yes, sir. Counsel, let me ask you this. If there is an agreement that there will be equal treatment or equal terms, but the parties don't know what those terms are, then would the representation that the parties are unaware of each other's terms be literally true? No, Your Honor, because of the timing. At the time that the — this all happened in March of 2001. Middle of 2001, the Justice Department announces we're going to look into this. These white papers were submitted way off in November of 2002. So in November of 2002, they are talking about what people know and — But what's the evidence that the parties actually knew the terms of each other's contracts? The only — the evidence that I'm citing is that they were told, that the lawyers were told that the terms were equal. I mean, I — if — and that's — I mean, that's what we have. And then the other evidence, I suppose, you'd have to go into the motion to reconsider to pull it all out because it wasn't before Judge Patel. But the other evidence I just mentioned, when it comes to what's important in these licenses, how you're going to split up the money, you could split up the money a million ways. Different people could negotiate for a different price per download and so on. Lo and behold, they all got the same deal. Take 50 percent of the net revenue, deduct — well, after deducting expenses, and then divide up that 50 percent of the net revenue according to usage, proportionality. What a surprise. Would you agree that if the representations that were made to the Department of Justice were literally true, there would be no violation of 1001? If they were literally true, there would be no violation of 1001. Although Herod talks about the difference between the Bronstan standard and the 1001 standard, I think — but I'm certainly not going to argue that literal truth is not a defense to 1001. But — and actually, but this isn't all. I mean, this isn't all that Judge — that the record has with respect to statements in the white paper. The white paper goes on, and this is the EMI written white paper, not just MusicNet, to talk about, nor does EMI exchange any other competitively sensitive information regarding its business or the businesses of other MusicNet participants. And they say, again, structural safeguards, minimize the risk that can set — and then they go on and say, we've got these firewalls, and we know of no breaches of the firewalls. They say all of those things. By their definition, knowing that they have equal terms with their competitors, partners in MusicNet, are a breach of the firewalls. Those statements are false once you understand that they know that they have equal terms. It's — and another instance, which Judge Patel pointed to, there was the Napster content agreement. These — these statements in the EMI and MusicNet white paper about firewalls and no shifting of competitively sensitive information is — is a breach of the Napster content agreement. Now, you've heard an argument in this Court about how the EMI was entitled to see that because of some contract that it had and that was in the record. That was not an argument that was made below. The argument below was that they were — that they had a right to see it because they didn't want to deal with Napster, and they had various other arguments. But if you look at the record below, they weren't arguing the contract. But even if they're right about the contract, the — they — the fact that the contract wouldn't allow Warner to — I mean, they're saying there's no breaches of the firewalls, and they know because they got it that Warner got it, too, and Warner is a direct competitor of — of Napster through its AOL subsidiary. So last point is they say there's no evidence about CINTER. I think I've — I've mentioned the — the repetition, the — the need to make these false statements. Okay. The — the fact that they cited these — We're over time, and why don't we — why don't we wrap it up? Yes, sir. Oh, you can say another sentence or two, but, you know — Well, I guess the last — the last sentence I want to say is that they're complaining about the scope of the order. She recognized — Judge Patel recognized the relationship between the illegality and the scope of the order. She limited it to the antitrust investigation, which, by definition, limits it in time and subject matter. And as I pointed out before, I am sure whatever the scope of the order is, there will be further litigation in the district court about that once the order is enforced. Okay. Thank you. Thank you. Very briefly, Your Honor. First of all, Mr. Kakaroff is wrong. We did argue specifically with the judge that under the MusicNet shareholder's agreement, EMI was entitled to see the Napster agreement. That was specifically argued at oral argument. It's in the transcript. I pointed her to Section 5.4c of the agreement. That was absolutely before the Court, before it issued even its first ruling. Number two, Mr. Kakaroff makes much that they didn't respond to the motion for reconsideration. That was their choice. Nobody stopped them from responding.  The terms of the content licenses, in fact, were not identical, although there may have been equal treatment, just as we disclosed to the Justice Department we understood. If you look at the sealed addendum to our brief, which we filed separately because it contains specifics about parties' content licenses, you will see that there are significant financial differences in the licenses that EMI, MusicNet, that EMI, Bertelsmann, and Warner each gave to MusicNet. Counselor. Orient. I'm sorry. Go ahead. Orient me. Now, in that sealed brief, is that part of the material you sought to present later to the district judge and you're now seeking to present to us outside the district court record, or was that in the district court record? Well, two things. Yes. Those particulars were part of the papers filed on reconsideration. But the MusicNet white paper itself suggests, and it was redacted. But the material you're now waving at me is material that was not presented to the district court record to seek reconsideration. Correct. It was part of the motion. And it's part of the material you're now seeking us to admit, even though it's not part of the district court record. I believe it is part of the district court record. It was part of the record on Round 2 rather than Round 1, but it absolutely was part of the district court record. And part of the district court record in the sense that you attempted to present it in the motion to reconsider. Correct. Okay. And if you look at the SOS v. Payday case, which I believe was a panel you were on, Judge Fletcher, that was a case, 806 F. Second, 1081. Yeah. That's Judge B. Fletcher. Better Fletcher. I apologize. But that's a case where the court said, even if the principal effect of including the motion for reconsideration within the notice of appeal is to expand the factual record on appeal, that's fine. The party that's opposing it has a full opportunity to respond in its papers. And that was a case where there was no appeal from the second ruling. In our case, we did appeal. We filed an amended notice of appeal the day after Judge Patel issued her ruling on the reconsideration. So both are fairly presented here, even in the – though it wasn't part of the notice of appeal in SOS, the court still considered the arguments in the motion for reconsideration. Let me ask you this. What's your response to opposing counsel's argument that regardless of the formula you used, you may have had different formulas? The bottom line was the same in terms of the remuneration. The bottom line was not the same, number one. That's what's documented in here. That's what the Justice Department found in its press release. It's perfectly public. In its press release closing the investigation, it said the terms are not identical. So it's factually wrong, number one. Number two, all we knew from the chairman of MusicNet was we were going to get equal treatment. Our terms would be no less favorable than what the other licensors got. And that's in our contract. It's not hidden in some side letter, as Mr. Glazer proposed. We said, no, put it in the contract. It's part of our economic terms. It goes in the contract. It was given to the Justice Department. It was flagged for them. It was discussed with them at a meeting. And my second question is, why wasn't the second e-mail provided to the Justice Department? It was. It was? Yes. As even Mr. Kecker conceded, it was at least in MusicNet's production to the Justice Department. I thought you said the opposite. I didn't hear him say that. He said, I do not believe that it was an EMI separate production. And I haven't been able to confirm that, in fact, it was. But we, but I believe he's conceded that it was produced by MusicNet, the other side of that e-mail exchange. So the DOJ had it. And in any event, all that e-mail says is, my boss, Rob Glazer, has already promised your boss, Eric Nicolay, that you'll be treated fairly and equally. That, that merely harkens back to the e-mail that we've been talking about between the chairman of the two companies. It's merely the lawyers on each side echoing what their bosses have already said. And, okay, you're over time, but let me ask you one last question. When you say you – that second e-mail was provided, what evidence is in the district court that says that that's so? I don't believe there was any evidence on that, but neither is there any evidence that it was withheld. Oh, well, I'm saying your co-counsel is about to tell you something. Okay. Mr. Epner reminds me that it was an Exhibit 62 with a Bates number showing that it had been produced by MusicNet. And it was an exhibit, again, originally presented to the district court or presented to the district court as part of the effort to get the district court to reconsider. On the original presentation. Okay. Exhibit 62 would be Exhibit 62 to Ms. Anderson's declaration, part of their original moving  Okay. So it was all – it was all before justice. Thank you. The case is now submitted for decision, and we have one last case for argument. UMG Recordings, Inc. v. Hammer-Winweb, UMG Recordings, Inc. v. District Court.
judges: Fernandez, W. Fletcher, Rawlinson